# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9264 | **DATE** | 5/29/2003 |
| **CASE TITLE** | Leslie D. McPherson vs. City of Waukegan, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant City of Waukegan's motion for summary judgment on Counts I, IV and V is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | MAY 3 0 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 59 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | TH ✓ | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LESLIE D. MCPHERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01 C 9264 |
| v. | ) | |
| | ) | |
| CITY OF WAUKEGAN and RANDALL COPENHARVE, | ) ) | |
| | ) | |
| Defendants. | ) | |

REDACTED

MAY 3 0 2003

MAY 3 0 2003

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, Judge:

Plaintiff Leslie McPherson claims that Defendant Randall Copenharve sexually harassed and assaulted her while they were employees of Defendant City of Waukegan ("Waukegan"). She has filed a five count complaint, with Waukegan named as a defendant in three of the counts. Waukegan moves for summary judgment. For the reasons stated herein, Waukegan's motion is granted.

## SUMMARY JUDGMENT

Summary judgment is appropriate where the evidence presented to the Court shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742 (7th Cir. 2003); Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

59

The party seeking summary judgment has the initial burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the movant has met this burden, it is up to the non-movant to present "definite, competent evidence to rebut the motion" and show that there is an issue of material fact. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). A mere scintilla of evidence in support of the non-movant's position is insufficient. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The Court views the evidence in the light most favorable to McPherson, as the non-moving party, and draws all reasonable inferences in her favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

## UNDISPUTED FACTS

### I. The Parties

Waukegan is a municipal corporation in northeastern Illinois. (R. 26-3, Waukegan's Statement of Material Facts ¶ 2.) McPherson worked for Waukegan in its building department as a clerical technician. (*Id.* ¶ 1.) In that role, McPherson had the responsibilities of answering phones, filing, and issuing building permits to customers. (*Id.* ¶ 19.)

The hierarchy of authority from highest to lowest in Waukegan's building department was: (1) William Durkin, mayor; (2) Donald Weekly, director of governmental services; (3) Larry Dixon, building commissioner; and (4) Defendant Randall Copenharve, assistant building commissioner. (*Id.* ¶ 17.) The office and clerical staff during McPherson's tenure consisted of five other individuals. McPherson, one of two clerical technicians, reported directly to Edna Nieves, who was a supervisor in the building department. Michelle Weland served as the office manager. (*Id.* ¶ 18.)

2

McPherson took direction from both Nieves and Copenharve. Nieves conducted and completed her performance reviews. (*Id.* ¶ 20.) Waukegan never disciplined McPherson during her tenure and granted pay raises based upon Nieves' performance reviews. (*Id.* ¶ 21.)

## II.     Waukegan's Workplace Policies

Throughout McPherson's employment, Waukegan maintained a policy prohibiting various forms of harassment. That policy stated, in relevant part:

> The Purpose of this Policy is to restate clearly and unequivocally that the City of Waukegan prohibits sexual, racial, and other harassment based on protected group status by all of its employees . . . . Any person who has a complaint of prohibited harassment by anyone at the City of Waukegan . . . is strongly urged to bring the problem to the attention of management. An employee's initial contact should be his or her immediate supervisor, up through the formal organizational hierarchy to the Department Head, to the Office of Human Resources, through to the Office of Mayor until the complaint has been addressed as effectively and responsibly as possible.

(R. 26-3, Waukegan's Statement of Material Facts ¶ 7.) Waukegan also had a policy on workplace violence. It provided, in part:

> It is the City's policy to promote a safe working environment for its employees. To this end, the City is committed to working with its employees to maintain an environment free from violence, threats of violence, harassment, intimidation, and all other disruptive behaviors . . . . Employees who experience or witness an incident of workplace violence are strongly encouraged to report it as soon as possible to the next-in-line supervisor . . . . The immediate supervisor is responsible for conducting a timely investigation into each reported incident of workplace violence . . . .

(*Id.* ¶ 9.)

McPherson was a member of the Service Employees International Union, AFL-CIO, Local 73, which negotiated a collective bargaining agreement with Waukegan. (*Id.* ¶ 11.) The

collective bargaining agreement contained a non-discrimination clause that stated:

> Neither party to this Agreement shall discriminate against any
> employee covered by this Agreement in a manner which would
> violate any applicable state or federal laws because of race, creed,
> color, national origin, age, sex, or political affiliation.

(*Id.* ¶ 12.) The collective bargaining agreement also contained provisions related to grievances and grievance procedures. Additionally, the collective bargaining agreement described the various types of leave available to employees. (*Id.* ¶ 15.)

### III.    Copenharve's Conduct

#### A.    Offensive Behavior

Copenharve first engaged in inappropriate behavior in March 1999, when he asked McPherson what color bra she was wearing. (R. 26-3, Waukegan's Statement of Material Facts ¶ 35.) McPherson neither told Copenharve that this question made her uncomfortable nor asked him to stop his behavior. (*Id.* ¶ 36.) Over the course of her employment, Copenharve asked her the same question a handful more times. (*Id.* ¶ 35.) He occasionally would enter the office area and say, "okay, ladies, what color is your bra today, does it match the underwear?" (R. 35-1, McPherson's Statement of Material Facts ¶ 77.) Weland, Waukegan's office manager, heard the comment on at least one occasion and told Copenharve, "that's enough, it's time for you to get out and do your job." (*Id.* ¶ 82.) Nieves, McPherson's supervisor, once laughed when she heard Copenharve's question. (R. 39-1, Waukegan Reply to McPherson's Statement ¶ 83.)

Also in March 1999, McPherson called in sick to Copenharve, who responded by asking if he could "make a house-call." (R. 26-3, Waukegan's Statement of Material Facts ¶ 37.) Again, McPherson did not tell Copenharve that she was offended by his statement. (*Id.*)

4

Copenharve asked this same question two or three additional times over the course of her employment, but McPherson did not complain or report his conduct to anyone. (*Id.*)

Two years later, in March 2001, Copenharve asked McPherson what color bra she was wearing and then pulled back her tank top with his finger to look at her bra. (R. 26-3, Waukegan's Statement of Material Facts ¶ 39.) McPherson pulled away from Copenharve, but did not say anything to him or object in any way. (*Id.*) No one else was on hand to observe this conduct. (*Id.* ¶ 40.) She did not complain or report Copenharve's behavior to Waukegan. (*Id.*)

### B. Physical Assaults

Later that month, on March 21, 2001, Copenharve called McPherson into his office. (R. 26-3, Waukegan's Statement of Material Facts ¶ 41.) McPherson entered, closing the door behind her. (*Id.*) Once she shut the door, there was no way for others to see into Copenharve's office. While he and McPherson were discussing a work document, Copenharve slid his hand under McPherson's shirt and felt her breasts. (*Id.* ¶ 42.) McPherson pulled away, asked him to stop, and said that his hands were cold. (*Id.*) Copenharve removed his hand from under her shirt. (*Id.*) As of March 26, 2001, McPherson had not reported Copenharve's conduct to anyone. (*Id.* ¶ 43-44.)

On March 26, 2001, Copenharve once again called McPherson into his office and asked her to shut the door. (R. 26-3, Waukegan's Statement of Material Facts ¶ 45.) She did so without objection. (*Id.*) Copenharve told McPherson that the reason he asked her into his office was that he was having a bad day and he wanted her to cheer him up. (*Id.* ¶ 46.) Realizing that he had nothing work-related to discuss with her, McPherson turned to leave his office. (*Id.*)

Copenharve stood up from his desk and approached McPherson. He began to sexually

5

assault her. McPherson protested and said, "somebody is going to walk in." (R. 26-3, Waukegan's Statement of Material Facts ¶ 47.) Within seconds, a co-worker opened the door and entered. (*Id.* ¶ 48.) In order to hide McPherson, Copenharve pushed her behind the door as it opened. (*Id.*) The co-worker, apparently unaware of McPherson's presence, put something on Copenharve's desk, left the office and shut the door. (*Id.* ¶ 49.) McPherson then also left Copenharve's office and returned to her desk. (*Id.* ¶ 50.)

### IV.  McPherson Reports The Incidents

After arriving at work the next morning, McPherson telephoned her sister-in-law, Mary Ellen Vanderventer, who also happened to be Mayor Durkin's daughter. (R. 26-3, Waukegan's Statement of Material Facts ¶ 56.) McPherson arranged a meeting at Vanderventer's house for later that morning. (*Id.*) At that meeting, McPherson told Vanderventer and an attorney for Waukegan about Copenharve's conduct. (*Id.* ¶ 57.) Afterwards, McPherson returned to work, where she received a phone call from Vanderventer. (*Id.*) Vanderventer, who was calling from Mayor Durkin's office, told McPherson to go home. (*Id.*)

### V.  Waukegan's Response

Within three hours of learning of McPherson's accusations against Copenharve from Vanderventer, Mayor Durkin called a meeting with Copenharve, a municipal attorney, the director of governmental services and the chief of police to discuss the situation. (R. 26-3, Waukegan's Statement of Material Facts ¶ 59.) Waukegan presented Copenharve with two choices: either it would suspend him and conduct an investigation or he could resign immediately. (*Id.*) Copenharve, although claiming his interaction with McPherson was consensual, decided to resign. (*Id.*)

## VI. McPherson's Leave

Without requiring a formal or informal request, Waukegan granted McPherson thirty days' leave, beginning the next day. (R. 26-3, Waukegan's Statement of Material Facts ¶ 64.) Waukegan fully compensated her during this thirty-day period and did not require her to deduct the absences from any other of her entitlements. (*Id.*) On April 26, 2001, near the end of her leave, Waukegan sent her a letter that stated:

> Friday, April 27, 2001 will be the last day that the City of Waukegan will pay you without deducting time from your time banks. If you are unable to return to work on Monday, April 30, 2001, the City of Waukegan will apply the time that you have on the books: 0.25 comp time, 44.50 sick, 4 personal and 16 vacation. This will give you approximately 8 days of pay.
>
> Effective May 1, 2001 you will receive 10 more vacation days, 1 sick day, and 3 personal days. Again, if you are unable to return to work, these days may be used to cover your time off work.
>
> If you are not able to return to work after exhausting all time, you must apply for a discretionary leave of absence from the City of Waukegan. Please advise and I will be happy to forward the proper forms to you.

(R. 26-3, Waukegan's Statement of Material Facts ¶ 65.) Despite this letter, McPherson did not apply for discretionary leave. (*Id.* ¶ 66.) Instead, she sent a letter on May 10, 2001 "demanding an additional ninety days of leave with pay and full benefits." (*Id.* ¶ 67.) On June 6, 2001, McPherson's attorney sent Waukegan a letter asking about the status of McPherson's employment with the City. (*Id.* ¶ 68.) It responded:

> Once the city received information of Ms. McPherson's allegations, the supervisor was summoned to the Office of the Mayor as part of the city's initial investigation. At this point the supervisor submitted and the city accepted his resignation of employment. With the employment relationship now severed, Ms.

7

> McPherson would not have any contact with this supervisor and would not be subject to what she declared to be a "hostile work environment."

\* \* \*

> Please be reminded that Ms. McPherson has not submitted the necessary applications for a Discretionary Leave of Absence . . . . The city has nonetheless maintained Ms. McPherson's position with the city and has kept her on active but unpaid status. Due to the workload of the department, Ms. McPherson's position has been filled on a temporary basis but remains available to her upon her return to work. Ms McPherson is a valued employee and we anxiously await her return.
>
> Please communicate with your client and inquire as to her intentions. Ms. McPherson is currently Absent Without Leave (AWOL) which places her employment at risk. Please help us help her.

(*Id.* ¶ 69.) McPherson's attorney responded to the letter the same day by stating:

> Leslie cannot return to work for the City. This is a difficult decision for her. She and her husband need the income and benefits. He [sic] enjoyed the work. Leslie was proud of her performance and found great pleasure in her service. But she cannot return to a work place that permitted sexual intimidation and created a hostile work environment.

(*Id.* ¶ 70.)

## ANALYSIS

Waukegan argues that the undisputed facts show that it is entitled to judgment on each of the three claims against it.[1] First, Waukegan maintains that it has established its affirmative

---

[1] Waukegan moved for summary judgment in its favor in McPherson's claim of intentional infliction of emotional distress in Count III. McPherson did not name Waukegan as a party, however, in Count III. She only sought liability against the city for intentional infliction of emotional distress based on Copenharve's conduct under a respondeat superior theory in Count IV.

8

defense as a matter of law related to McPherson's sexual discrimination claim. Second, Waukegan argues that it is not liable for Copenharve's battery and intentional infliction of emotion distress of McPherson under a respondeat superior theory as a matter of law. Third, it claims that it is not required to indemnify Copenharve for his actions because he was acting outside of the scope of his duty as a matter of law. The Court agrees with all three of Waukegan's contentions.

**I.    Waukegan Is Not Liable For Copenharve's Sexual Harassment Of McPherson**

In order to be actionable under Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). To determine whether an environment is sufficiently hostile or abusive, a court looks at all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88, 118 S.Ct. at 2283 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)). Waukegan does not challenge for the purposes of summary judgment whether a hostile work environment existed after the March 21, 2001 sexual assault. Instead, it claims that it is entitled to summary judgment because the undisputed facts show that it cannot be liable for the hostile work environment.

Where, as here, a supervisor is the harasser, the employer is strictly liable for his conduct, although the employer may raise an affirmative defense that precludes its liability. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). Waukegan claims that the

undisputed facts demonstrate that it is entitled to judgment on the affirmative defense discussed in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In *Ellerth*, the Supreme Court established an affirmative defense for employers where supervisors have created a hostile work environment:

> When no tangible employment action is taken [against the employee claiming harassment], a defending employer may raise an affirmative defense to liability or damages . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.*, 524 U.S. at 764-65, 118 S.Ct. at 2270. To be able to take advantage of this affirmative defense, therefore, Waukegan must first demonstrate that the undisputed material facts show that it took no tangible employment action against McPherson.

### A. McPherson did not Suffer a Tangible Employment Action

To show that she was the victim of a tangible employment action, McPherson must demonstrate that there was "a significant change" in her employment. *Id.* at 761, 118 S.Ct. at 2268. Such significant changes include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* While Waukegan claims that it took no tangible employment action against McPherson, she maintains that she was constructively discharged. The Seventh Circuit has yet to determine whether a constructive discharge is a tangible employment action within the meaning of *Ellerth*. *See Wolf v. NW Ind. Symphony Soc'y*, 250 F.3d 1136, 1142 (7th Cir. 2001). It makes no difference in this case, however, because there is no genuine issue of material fact as to whether

10

Waukegan constructively discharged McPherson.

A constructive discharge occurs where an employee resigns because the hostile work environment has created working conditions that have made remaining with the employer "simply intolerable." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998). Absent extreme circumstances, an employee is expected to stay on the job while seeking redress. *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 667 (7th Cir. 2001).

If Copenharve had continued to work in the office, McPherson certainly could have made a legitimate argument that Waukegan constructively discharged her. There can be no doubt, based on the undisputed facts, that Copenharve subjected her to extraordinary conditions on March 21 and March 26, 2001. But, within hours of learning of Copenharve's conduct, Waukegan caused Copenharve's employment to end. Upon learning of McPherson's charges against him, Waukegan forced Copenharve to make a choice: accept a suspension during the pendency of the investigation or resign immediately. Copenharve chose the latter. When he did so, the only person who had engaged in sexually offensive behavior was no longer in the office. The extraordinary conditions therefore followed Copenharve out the door. McPherson chose to resign months later, when the extraordinary conditions no longer existed. Therefore, McPherson did not suffer a tangible employment action through a constructive discharge.

### B. Waukegan is Entitled to Summary Judgment on the *Ellerth* Affirmative Defense

Congress designed Title VII to encourage employers to create anti-harassment policies and effective grievance procedures. *Ellerth*, 524 U.S. at 764, 118 S.Ct. at 2270; *see also Hill v. American Gen. Fin., Inc.*, 218 F.3d 639, 644 (7th Cir. 2000) ("the goal of Title VII is prevention,

11

not damages."). "[T]he law does not require success – it only requires that an employer act reasonably to prevent sexual harassment." *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999). Therefore, employers are entitled to an affirmative defense under *Ellerth* where: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth*, 524 U.S. at 764-65, 118 S.Ct. at 2270.

### 1. Waukegan exercised reasonable care to prevent and correct promptly Copenharve's sexually harassing behavior

Waukegan meets the first element of the *Ellerth* affirmative defense because the undisputed facts show that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior. Waukegan generally exercised this care through its policy that prohibited sexual harassment. Its policy "strongly urged" employees to bring harassing conduct to the attention of management. Waukegan detailed the procedure for complaining about this behavior in its policy. It is more strongly worded than at least one policy that the Seventh Circuit has found to be sufficient for the employer to meet the first *Ellerth* element. *See Hardy v. Univ. of Ill. at Chi.*, 328 F.3d 361 (7th Cir. 2003) (policy that encouraged reporting of harassment and suggested various mechanisms to submit grievances was reasonable to prevent and correct sexual harassment). Specific to McPherson's situation, the undisputed facts show that Waukegan acted reasonably to prevent and promptly correct Copenharve's sexual harassment within hours of learning of his behavior by offering him the choice of suspension pending investigation or immediate resignation.

McPherson claims, however, that Waukegan did not take reasonable care to prevent or correct sexual harassment. She argues that it did nothing to stop Copenharve's behavior even after Nieves and Weland overheard Copenharve ask about the color of the female employees' bras. The evidence before the Court, however, does not support this position. The undisputed facts show that Nieves, who was McPherson's immediate supervisor, overheard Copenharve's question on one occasion. The record shows that Weland was also only present for the comment once. It is clear that these two comments on their own could not have amounted to a hostile work environment. *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) ("less severe acts of harassment must be frequent or part of a pervasive pattern of objectionable behavior in order to rise to an actionable level"). McPherson has not developed an argument, however, that explains the knowledge of these two comments, which would not be actionable on their own, could somehow put Waukegan on notice that sexual harassment was taking place.[2]

The undisputed facts show that Waukegan could not have known about a hostile work environment even if it knew of these two comments. One of the elements of a hostile work environment claim is that the employee subjectively found the conduct to be offensive. *Faragher*, 524 U.S. at 787, 118 S.Ct. at 2283. There is no evidence that McPherson confided to anyone at Waukegan that she found Copenharve's statements and questions to be offensive. Contrary to McPherson's assertions, the undisputed facts show that the first time that Waukegan reasonably could have had knowledge of a hostile work environment was on March 27, 2001,

---

[2] McPherson also has not explained why Weland's knowledge of one of the statements should be imputed to Waukegan. McPherson has presented no evidence of Weland's rank and duties within Waukegan. Although Weland is the office manager, this title alone is not enough to show that she is something other than a low-level employee with Waukegan.

13

when McPherson informed the municipality of Copenharve's assaults on her.

### 2. McPherson unreasonably failed to take advantage of any preventive or corrective opportunities provided by Waukegan or to avoid harm otherwise

McPherson does not dispute Waukegan's assertion that it can meet the second *Ellerth* element. Indeed, the undisputed facts show that she unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. McPherson failed to complain to any supervisor about Copenharve's offensive comments for two years. Only after it escalated to sexual assault did McPherson inform the city of his conduct. In this respect, the case is analogous to *Gawley v. Indiana Univ.*, 276 F.3d 301 (7th Cir. 2001). In *Gawley*, the Seventh Circuit affirmed a summary judgment ruling in favor of the defendant employer where an employee failed to report "a steady escalation of harassing behavior, over many months, with the victim failing to use the procedures her employer put into place until especially egregious conduct occurred." *Id.* at 315. The same can be said here, where McPherson did not inform Waukegan of Copenharve's sexual harassment until too late, when it could no longer attempt to correct or prevent the situation. Because the undisputed facts show that Waukegan has established both elements of the *Ellerth* affirmative defense, it is entitled to judgment as a matter of law on McPherson's claims of sexual discrimination. Accordingly, the Court enters judgment on Count I in favor of Waukegan.

## II. Waukegan Is Not Liable For Battery Or Intentional Infliction Of Emotional Distress Under Respondeat Superior

In Count IV, McPherson seeks to hold Waukegan liable for her battery and intentional infliction of emotional distress claims against Copenharve through the doctrine of respondeat

14

superior. Waukegan claims that it is entitled to judgment as a matter of law because McPherson's claims in Count IV are preempted by the Illinois Workers' Compensation Act, which "bar[s] employees from bringing common law actions against their employers based solely on the respondeat superior doctrine." *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1017 (7th Cir. 1997).

The Illinois Workers' Compensation Act is the "exclusive remedy for accidental injuries." *Id.* at 1016. Even if an injury is intentionally inflicted upon an employee by a co-worker, the act will generally be considered an accidental one in relation to the employer. *Id.*

McPherson, recognizing these concepts, seeks to escape preemption by the Illinois Workers' Compensation Act by arguing that Waukegan itself "committed, commanded, or expressly authorized" the tort against the employee. (R. 32-1, Pl.'s Mem. in Opp. to Summ. J. at 10-11 (citing *Thomas v. Habitat Co.*, 213 F.Supp.2d 887, 893 (N.D. Ill. 2002).) She maintains that Waukegan's knowledge (through Nieves and Weland) of Copenharve's sexual harassment, plus a lack of follow-up action, is equivalent to express authorization of injurious conduct. (*Id.* at 11.) The Court, however, has already rejected the notion that Waukegan had knowledge of Copenharve's sexual harassment before March 27, 2001. Once informed, it immediately acted to stop Copenharve's actions. In this situation, the Illinois Workers' Compensation Act does preempt McPherson's respondeat superior claims because Copenharve's harassment of McPherson can only be deemed accidental acts by Waukegan. Accordingly, the Court enters judgment on Count IV in favor of Waukegan.

### III. Waukegan Is Entitled To Judgment As A Matter Of Law On McPherson's Indemnification Claim

In Count V, McPherson seeks to have Waukegan indemnify Copenharve for his conduct. According to the Illinois Tort Immunity Act, "a local public entity is empowered and directed to pay any tort judgment for which it or an employee while acting within the scope of his employment is liable." 745 ILCS 10/9-102. Waukegan maintains that Copenharve's sexual misconduct was not within the scope of his employment. .

Under Illinois law, sexual misconduct is generally not within the scope of employment. *See Dorsey v. Givens*, 209 F.Supp.2d 850, 852-53 (N.D. Ill. 2001); *Deloney v. Bd. of Educ. of Thornton Township*, 666 N.E.2d 792, 797-800 (Ill. App. Ct. 1996); *Randi F. v. High Ridge YMCA*, 524 N.E.2d 966, 970 (Ill. App. Ct. 1988); *Bates v. Doria*, 502 N.E.2d 454 (Ill. App. Ct. 1986); *Webb by Harris v. Jewel Cos., Inc.*, 485 N.E.2d 409 (Ill. App. Ct. 1985). Plaintiff, however, contends that the abuse was within Copenharve's scope of employment because Waukegan purportedly reasonably could have anticipated that Copenharve was going to sexually abuse McPherson. McPherson again rests her argument on the two Copenharve questions about the color of underwear that Nieves and Weland overheard. She does not explain, however, how Waukegan's knowledge of these two utterances could have provided it with notice that he was going to sexually assault her. As discussed previously, the undisputed facts show that as soon as Waukegan became aware of Copenharve's sexual harassment, it immediately caused that harassment to end. Because it could not have reasonably anticipated Copenharve's acts, Waukegan is not liable for indemnification as a matter of law. Accordingly, the Court enters judgment on Count V in favor of Waukegan.

## CONCLUSION

Although the undisputed facts show that McPherson was the victim of extreme acts of sexual abuse by her supervisor, they also demonstrate that Waukegan cannot be liable for those acts as a matter of law. Accordingly, Waukegan is entitled to judgment as a matter of law on Counts I, IV, and V.

Dated: May 29, 2003

AMY J. ST. EVE
United States District Court Judge